IN RE GUARDIANSHIP OF ANNA VOGELPOHL.

No. 48024.

(Reported in 53 N.W.2d 151)

MAY 6, 1952.

Charles T. Johnson, of Denison, and Leonard W. Fromm, of Harlan, for appellant.

W. E. Kahler and L. W. Powers, both of Denison, for appellee.

BLISS, J.—The record discloses many unusual and bizarre incidents which demonstrated the need of a competent and honest guardian to conserve the property of these wards and to provide them with proper care. The facts are controlling. The parents of the wards, in the early days, settled on a farm in Crawford County, near the present village of Ricketts. The two daughters and three sons were born to the parents. The family had few outside contacts. They worked hard, lived plainly, spent little on pleasures or education, and saved much. The father and mother and all of the children but the two girls and Louie (a son) died several years ago. None of the children married. Mary and Anna and Louie lived on the farm and operated it together. The family had acquired nine hundred and sixty-six acres of land, made up of five farms, and personal property amounting to about $150,000. Louie died in September 1945. Mary and Anna were his only heirs. They thus came into the ownership and possession of all the Vogelpohl property. They continued to live in the old farm home. They were feeble in body, unstable of mind, illiterate, and apparently easily influenced.

Arthur H. Sievert, the undertaker at Charter Oak, had charge of some of the earlier funerals in the Vogelpohl family and acted in the same capacity at Louie's death. John Meyer, a son of August Meyer and a nephew of Adolph Meyer, who were

first cousins and nearest kin of Mary and Anna, lived on his farm three quarters of a mile distant from the Vogelpohl home. After consultation with his father but without discussion with his Uncle Adolph, John Meyer, on September 11, 1945, a few days after the burial of Louie, took Anna Vogelpohl with him to Denison, where they consulted an attorney, Mrs. P. W. Harding, who prepared a petition for the appointment of John Meyer as administrator of Louie's estate. Anna, who was the only one of the girls who could write, signed this petition. Though the record does not disclose that Sievert suggested to John Meyer that he become administrator, he soon became very active in assisting Meyer in the administration of the estate and so continued during the three years preceding its closing in 1948. Mrs. Harding was a witness in the trial and testified that Mr. Sievert demanded of her a share of the attorney fees she was receiving from the estate, and upon her refusal she was discharged at a meeting with Mr. Sievert and Mr. Meyer. The latter testified that upon the recommendation of Mr. Sievert he appointed Charles Johnson as attorney for the estate, and later also appointed Leonard Fromm.

The value of Louie's estate, according to John Meyer, was "roughly seventy or eighty thousand dollars." Meyer also testified:

"I was allowed $8000 as administrator fee. Part of this was given to Mr. Sievert for his assistance. I don't recall, but he didn't get half of this fee. * * * I maintain two accounts: one for the Vogelpohl ladies, which was a small account on which they drew for their own personal needs, and another account which I used as attorney-in-fact to conduct their business. I do not recall exactly how much I paid myself. During the period the estate was in probate I received $250 a month and I do remember this fee schedule was followed after the estate was closed to the present date. [The trial was in June 1951.] I paid Mr. Sievert for his assistance out of the $250 a month fee which I paid to myself."

On March 22, 1947, John Meyer procured from both Mary and Anna a separate but identical power of attorney appointing him the agent of each "to manage all my personal and business

affairs, farms and otherwise, including the power to make leases and contracts; to hire and fire; to buy or sell farm products, produce, livestock and feed, as the occasion requires; to request, demand and collect, by suit, settlement, or otherwise, all rents, notes, mortgages, moneys, or debts of every kind which are now due, or shall become due, owing or belonging to me; to receive and give receipts for all moneys taken in from whatever source; to pay all taxes * * *; to buy all things necessary for the proper upkeep of my property and my personal welfare; to make such investments for me as men of prudence, discretion, and intelligence would exercise in the management of their own affairs, providing, however, that he shall not be permitted to make personal loans of any kind on anything or to buy real estate or mortgages of any kind; also, reserving unto myself the right to grant, bargain, sell or convey, any of my real property, providing, however, that, in the event of any such sale, deed, mortgage, or otherwise, the papers therefor shall be signed and joined in by my said attorney, John Meyer, it being understood that neither he nor I alone may sell, convey, mortgage or otherwise dispose of said real property; otherwise giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intents and purposes as I might or could do, if present at the doing thereof, with full power of substitution and revocation, reserving the right to revoke this power of attorney at my pleasure; hereby ratifying all that my said attorney or his substitute shall lawfully do or cause to be done by virtue hereof." The power of attorney with Mary's signature, which was written by Anna, was witnessed by Mr. Sievert.

The assessment roll for Mary and Anna for 1950, signed by John Meyer as attorney in fact, showed moneys and credits of $25,000, real-estate mortgages of $37,000, or a total of $62,000, and for 1951, $14,000 in the bank, $25,000 promissory notes, $18,000 real-estate mortgages, and $2500 chattel mortgages.

On the "—— day of June 1948" Anna and Mary signed a receipt acknowledging that as sole heirs of Louie they had received in the final distribution of his estate from John Meyer, administrator, full payment of all sums due them from said estate. Concerning this John Meyer testified:

"The signatures which appear on this document were both signed by Anna Vogelpohl, and Mary just watched. At that time I represented them under a power of attorney from them, and I have continued to handle the business under that power of attorney so that I never actually turned over the estate to them. * * * They agreed that I could sign checks for the payment of my services. Anna does have a small checking account of her own."

On June 7, 1950, Mr. Sievert procured a separate power of attorney from Anna and Mary, the body of which is identical with those given to John Meyer, and set out above. They were prepared by Charles Johnson. Mr. Sievert testified:

"I have a contract for funeral services for the Vogelpohl ladies that was entered into on or about April 13, 1950. It was drawn up in Johnson's office in Denison, Iowa. John Meyer had the contract written up under their instructions. It was signed by them at their home when taken there by John Meyer. I was not present. The contract calls for merchandise and funeral services in the sum of $4250 each."

In the winter of 1950–1951 Mary and Anna were living alone on the farm. Anna became ill with pneumonia in January 1951 and John Meyer took her to a hospital in Sioux City, where she remained for twenty-seven days until February 10, 1951, when Mr. Meyer took her to a nursing home in Carroll. The next day Mr. Meyer placed Mary in the same nursing home. They remained there until in March 1951 when Mr. Meyer took them to his home in Mr. Sievert's ambulance, where they remained and were at the time of the trial.

Adolph Meyer, seventy-three years old, with two of his married daughters and their aunt and one of his sons-in-law visited Anna at the hospital in Sioux City and returned later but found that Anna had been taken away. On Washington's Birthday, February 22, 1951, this same group of relatives of Anna and Mary visited them at the nursing home. They were witnesses at the trial, and testified that Anna complained of the way Art Sievert and Johnny Meyer had treated them, and wished to get them both out, and to get Pete Claussen as their guardian. Mary and Anna said they wanted to be in their own

home. Anna signed her name to a note stating these matters, in substance, and Mary affixed her mark to a similar note: Adolph Meyer testified:

"I told her [Anna] that I would try and get John and Sievert out of her business affairs. * * * Pete Claussen's name was mentioned in that he should be guardian of them. She mentioned we should get Mr. Sievert out. They read the papers before they signed. After reading the papers, Anna says, 'Now see to it. Get that done.' Mary signed after she read the papers."

P. H. Claussen (Pete Claussen) testified, in substance: that he lived in Ricketts and was a banker there and had been employed in the Farmers Savings Bank at that place, and was president of the bank, and had been the manager or head man of the bank since 1910; the Vogelpohl farm was a little over a mile from Ricketts and he had known Mary and Anna for forty years or more, and knew Louie, who had owned twenty shares of stock in the bank; he knew the farms that Louie and the other deceased brothers had owned; the bank was closed on Washington's Birthday, and Adolph Meyer and members of his family met him on the street, about 4 p.m., and told him of their visit with Mary and Anna and that the Vogelpohl girls desired him to be guardian of their property, and he was asked if he would accept, and he told them he would, but it would be necessary to consult an attorney and have the proper papers prepared; he then arranged for an appointment with Attorney W. E. Kahler at his office in Denison for the next morning, February 23, 1951; we met at the office between nine and ten o'clock in the forenoon; knowing of the powers of attorney, he had Mr. Kahler prepare revocations of them, the petitions for his appointment as property guardian, and while he had not been asked to prepare wills he thought it well to have them; he and Adolph Meyer and members of his family took the papers to the nursing home in Carroll; he asked Anna if they wished to cancel the powers of attorney held by Mr. Sievert and John Meyer, and to have him as guardian of their property and she said that they did; he had told Mr. Kahler to draw a will for Mary leaving her property to Anna, and a like will for Anna leaving her property to Mary; Anna and Mary read the papers, and the wills were explained

to them, and they handed them back and said they were "all right." Arthur Neu, who had practiced law in Carroll for twenty years, testified that Mr. Claussen, Adolph Meyer, and others had called at his office late in the afternoon of February 23, 1951, and asked him to notarize some papers at the nursing home, and that he went there with them; that he recalled that Anna read the petitions, and that they were explained to Mary, who appeared to be looking them over with a magnifying glass; they were explained to her and she seemed to understand and took her directions from Anna, and signed them by mark. Mr. Neu then took the verifications of Mary and Anna. Mr. Claussen testified that both Mary and Anna appeared to know what they were doing; that he spoke low German, which language the Vogelpohl girls used as well as English. He testified that he had experience as administrator, executor and guardian during a period of twenty-five or more years. Other witnesses testified to the business ability, honesty and good character of Mr. Claussen, and expressed their opinions that he was worthy and well qualified to be the guardian of the property of Mary and Anna.

At the conclusion of the testimony for the guardian, Mr. Cullison and Mr. Powers, counsel for the respective litigants, accompanied by the presiding Judge, interviewed Mary and Anna briefly on the first floor of the courthouse, they being unable to climb the stairs. Three written interrogatories were propounded to Anna. She answered that they liked it in Carroll, that she was feeling fine and better than she had been feeling, that she "would like to live in my own home, my country home", and that she had been "treated all right."

The Court said: "Mary Vogelpohl very obviously heard nothing that was going on, or said, and that Anna did hear when counsel speaking directly into her ear would say something. The two elderly ladies appeared to be well fed, but very poorly and shabbily dressed, and that to a stranger it would appear they were suffering from dire poverty as far as their clothing and appearance is concerned."

The petition which Anna executed on February 23, 1951, alleged, in substance, that she was past seventy years old and in poor physical health, and was possessed of real and personal property, which she was not able to manage because of her phys-

ical condition and lack of experience, and she therefore asked for the appointment of a guardian over her property, to manage, conserve and protect it; that P. H. Claussen was a fit and proper person to act as such guardian, was willing to so act and to furnish the required bond, and she asked for his appointment.

The petition was filed in the office of the Clerk of the Crawford County District Court on Monday, February 26, 1951. On the same day the following order was entered:

"Now to wit on this 26th day of February 1951 this matter came on for hearing on the application of Anna Vogelpohl of Crawford County, Iowa, for the appointment of P. H. Claussen as guardian of the above entitled estate.

"And it appearing that said application is not contested; that said Anna Vogelpohl is a resident of Crawford County, Iowa; it is therefore ordered that said P. H. Claussen be appointed guardian of said estate upon filing bond in the sum of $50,000 with sureties to be approved by the Clerk of the District Court.

"By The Court: signed Emil M. Peters
Clerk of the District Court of Crawford County."

Mr. Claussen qualified by giving the required bond in each estate.

Referring again to the 23d day of February, 1951, John Meyer testified that without any knowledge that his Uncle Adolph and members of his family and Mr. Claussen had been at the nursing home that day he called on Mary and Anna the evening of that day, intending to stay all night, and return home the next day, which he did; Anna told him that evening of the visitors who had called on her that day and of the execution of papers revoking his power of attorney and that of Mr. Sievert, and the application for the appointment of Mr. Claussen, and that the next day, which was Saturday, February 24, 1951, he contacted his attorney, Mr. Johnson, and had him prepare some papers to reinstate the power of attorney of Mr. Sievert, which papers he and Mr. Sievert then brought to the nursing home for execution by Mary and Anna. These two new powers of attorney for Mr. Sievert were each separately executed by Mary and Anna, on February 24, 1951. The body of each instru-

ment was identical with that of the other and with the canceled powers of attorney except for the last three lines in each of the new papers, which were as follows: "* * * I hereby specifically revoke any power or powers of attorney granted by me from February 1, 1951 to February 23, 1951, inclusive."

Mr. John Meyer also testified on redirect examination: "On the evening of February 23, 1951, when I visited the girls at the Tryon Nursing Home at Carroll, Anna gave me a letter which she had written and which she said she was mailing to me, but since I was there she would give it to me." Appellant introduced this letter and envelope. The originals have not been certified to this court but copies are set out in the printed record. The letter is as follows:

"February 23, 1951
Evening

"Dear John,

Today we had lots of company. Adolph Meyer and family, Fred Hansen. They want us to go Home but we don't to go yet. Its to cold. They said Mr. Severt out, of our business. They had Petr Claussen with them. And had us sighn some administration papers this is what that is what they told us. They had one more man along. They would not let us read papers over like you do. Rev. Herrman was here too. John you and Scvrt have taken good of us. That is all we want. So long.
Anna Vogelpohl."

Mary was totally deaf and her sight was very poor. She used a magnifying glass in reading. Anna could see fairly well, but had difficulty in hearing unless the speaker spoke loudly and directly into her ear. Appellants introduced a letter, dated March 31, 1951, from a doctor which stated: "It is my belief that, at the present time, Miss Anna and Miss Mary Vogelpohl are incompetent to conduct their own business. I believe Anna was incompetent at least from the time she came down with pneumonia in January * * *."

On March 9, 1951, Mary and Anna each filed a resistance and answer to the petitions which each of them had signed February 23, 1951 and filed February 26, 1951, in which resistance each alleged that she did not know what she signed on

February 23, 1951; that Adolph Meyer and P. H. Claussen deceived them as to its contents and would not let them read the petitions; that Mr. Claussen was unworthy of trust and that they would not have signed had they known that the petition was for his appointment as guardian of their property.

There was no evidence offered as to the proof of any of these allegations. Each resistance also alleged that the clerk of the district court had no authority to appoint Mr. Claussen as property guardian and that his appointment was a nullity and void ab initio; John Meyer should be appointed guardian of their property and Arthur H. Sievert as guardian of their persons, as they were fit and proper persons and had handled their business affairs to their complete satisfaction. They prayed that the appointment of Mr. Claussen be set aside and the appointment of John Meyer and Arthur H. Sievert be made as alleged.

Mr. Claussen, the guardian, challenged the pleading of Mary and Anna by a reply alleging that he had been appointed in response to a petition and prayer of the wards for his appointment and had qualified and they were estopped from attacking said order; he denied that the judgment and said order appointing him was void, but was valid and effective; he denied all allegations that any deceit, threat or misrepresentation was used in procuring the signatures of the wards; he then alleged the facts as to how he consented to become guardian; that he is unable to believe the pleading filed by the wards on March 6, 1951 represents their true sentiments, and requests that they be examined in the presence of the court, so that the court may have the benefit of such personal contact in determining the state and condition of mind of the wards and their ability to look after their property and interests; he prayed that the pleading filed by the wards be stricken, and that the judgment and order of the court entered by the clerk be confirmed by the court; that in the event the court determined that the appointment of a guardian is still open, and is not foreclosed, that the court find that he; who had qualified and had been acting as guardian, be confirmed in that position and a proper order be entered appointing him, or ratifying and confirming the order of the clerk in making such appointment; that the court enter such additional orders and judgments herein as the facts might warrant, with

a view of carrying out the wishes of the wards so far as consistent with the primary duty of the court to protect and preserve the property of the wards, who are incapable of doing so.

On May 9, 1951, each ward amended "the resistance to petition and application for appointment of guardians" filed on March 6, 1951, by striking the prayer and substituting instead "that petitioners pray they be allowed to amend the petitions filed by them on February 26, 1951, and all other papers, pleadings and instruments executed by them, and that said petitions filed February 26, 1951 be so amended as to request John Meyer and Arthur H. Sievert be appointed guardians of the property as the court may direct, and for the care, comfort and support of the petitioners herein under such circumstances, direction and authority as the case may require; that the order made and entered in the cause be set aside and annulled, and that all proceedings had and taken thereunder be decreed to be of no force and effect."

On May 24, 1951, the wards filed a petition to vacate or modify the judgment appointing P. H. Claussen so as to appoint John Meyer guardian of the person and property of Anna, and that Arthur H. Sievert be appointed guardian of her property to act jointly with John Meyer.

On May 9, 1951, the court in ruling on a question of law raised in the pleading determined and held that the appointment of the guardian by the clerk was not void ab initio.

Before resting at the close of the main case, there was a colloquy between the court and counsel in which Mr. Cullison, for the wards, suggested that the court interview the wards at the home of John Meyer, where they were staying, to ascertain their wishes with respect to their guardianship, and any other pertinent matter. Mr. Cullison further stated: "I appreciate the fact that in this case the people primarily interested are the wards themselves. I think it is clear enough in the record that while the application is a voluntary one, still I think the evidence is sufficient to show that their condition is such that a guardian for both their person and property is warranted in the record." Opposing counsel objected to this unusual procedure and insisted that the wards should come into court and sustain their pleaded contentions, where they would be subjected to cross-examination.

The court opined that nothing would be accomplished by attempting a conversation with the wards as suggested.

At the close of all the evidence the court said:

"By a paper filed on the 26th day of February, 1951, in each of these guardianships Anna Vogelpohl and Mary Vogelpohl invoked the jurisdiction of the court for the appointment of a guardian. The evidence, and I think the admission of counsel into the record in the hearing, clearly indicates that a guardian for each of the wards should be appointed and be in charge of the property.

"The record of the administration of the affairs of these two wards in the past is not sufficient as to warrant the approval of this court. At the suggestion of counsel this court went to the first floor for the purpose of listening to a few questions and answers by the wards, and observed their appearance. These women are the owners of considerable property. They appear to be well fed as far as their outward appearance goes, but other than that their appearance would indicate they are paupers. There is no reason in the world why these women in the later years of their life shouldn't be enjoying every comfort and even every luxury. To what extent they would enjoy luxury, I, of course, cannot say, but the record in this case, their own actions, their own invoking of the jurisdiction of this court, their own appearance from all the testimony indicates a guardian shall be appointed for both their person and their property.

"A guardian has been appointed for their property. The showing in this case is not such as under our statute for the removal of a guardian would justify the removal of the present guardian, who is qualified and acting. I think Mr. Claussen, the present guardian, acted in good faith, is competent, and is qualified to act as guardian of the property, and it is the opinion of this court that there is no animosity between Mr. Claussen and the wards. Mr. Claussen even indicated on the witness stand that he was not anxious to serve as the guardian of the person.

"These two wards indicated to the court that they would like to live in their own home, which is a perfectly natural desire of people in their later years. But the evidence of Dr. Cochrane indicated that when they were taken to Carroll from this home

of theirs they had been suffering from frostbite, which clearly indicated that in their own home they were not living with the care and attention and comforts to which they are entitled. I think they need someone to look after their persons. I think they need someone with whom they are acquainted so that they will not be disturbed and distressed. It was the reaction of this court that they responded in a friendly and confident manner to one of their counsel who was interrogating them. It would be the suggestion of this court that the house belonging to these old ladies be modernized and fixed and improved so as to make a comfortable home in the place where they live, and that a proper and companionable person be employed to look after them.

"The petition for the removal of Mr. Claussen as guardian is denied. He is confirmed in the appointment as guardian of the property, under the present bond, which is adequate, and the court·on its own motion will appoint Mr. Bennett Cullison of Harlan as guardian of the person of these individuals, under bond of $5000, and the suggestion of this court is that the guardian of the person and guardian of the property work in co-operation for the benefit and welfare of these old ladies, fix up their home, let them live as they wish with every possible comfort and convenience, and that they be saved from unnecessary annoy-ances. Mr. Cullison, I noticed that these old ladies seemed to approve of you."

The court made an order confirming and continuing P. H. Claussen in office as guardian of the property of each of the wards, and further found, ordered and adjudged that the wards, having invoked the jurisdiction of the court and having prayed for the appointment of a guardian of their person, "it is accord-ingly ordered, adjudged, and decreed that Bennett Cullison, having appeared as counsel for said wards, be, and hereby is, appointed as guardian of the person of each of said wards, under bond of $5000 to be approved by the clerk."

The evidence and the entire record preponderantly sus-tain the findings, conclusions and orders of the able trial court. Later discoveries and developments added confirmation to their soundness, and established beyond the possibility of a reasonable doubt the complete unfitness of Arthur H. Sievert and John Meyer to be guardians of these wards in any capacity.

On July 9, 1951, Mr. Claussen, the guardian, filed application in the court below for leave to supplement the record, alleging that: since the final order of the court, attorneys Johnson and Fromm had served notice of appeal; since the entry of the court's order and judgment a deed had been filed for record by which the wards had conveyed all their real estate to Arthur H. Sievert and John Meyer, on February 24, 1951, and was in existence at the time of the trial, and no disclosure of the fact was made to the court; that for a court to pass upon the application of Sievert and Meyer without knowledge of their procuring such deed would be a fraud upon the court, and good conscience requires that the record should disclose the fact.

The applicant prayed that the cause be reopened to permit him to introduce evidence as to the procurement of said deed and of its existence at the time of the hearing.

The conveyance was a quitclaim deed, absolute and without condition or reservation, "in consideration of the sum of One dollar, Affection, thoughtfulness, and loving care, in hand paid by John Meyer and Arthur H. Sievert." It described and conveyed five separate tracts of land containing nine-hundred and sixty-six acres in Soldier Township, Crawford County, Iowa, and also "Lot 12 Block 3 in the town of Ricketts." It recited that "the grantors aforesaid hereby relinquish all contingent rights, including the right of dower and homestead which they have in and to the said premises."

The deed bears date of February 24, 1951. It was signed by Anna Vogelpohl, and by Mary Vogelpohl by affixing her mark or X. The execution of the deed is noted as having taken place in the presence of Fred A. Claussen and Augusta B. C. Tryon, and was acknowledged on February 24, 1951, before a notary public.

On July 16, 1951, an amendment was made by the guardian to his application of July 9, 1951, reciting that he was advised that at the time the quitclaim deed was executed Arthur H. Sievert and John Meyer also obtained a bill of sale or other instrument from Anna Vogelpohl conveying all her personal property to them, of which they made no disclosure to the court. The amendment prayed as in the original application and asked

permission to introduce evidence with respect to the conveyance of the personal property.

The court, on July 17, 1951, ordered the granting of the application and "that the evidence offered in connection therewith on this date be and hereby is made a part of the record heretofore filed in each of the above matters." Before the hearing of the testimony on July 17, 1951, the court said: "Let the record show that on Monday, July 16, this court received a letter by registered mail from Anna Vogelpohl which I think should be identified and received as part of the record herein, and placed in the files. I have read it." The letter (marked as "Court's Exhibit 'X'") is as follows:

> "Charter Oak, Iowa.
> July 13-51

"Dear Judge.

Lawyer Kolleson told John Meyer that you was comeing to see uz bot you dont come. I was at your hoose once, but you was not at home. In the Court house we did not get to tell you much. So I am writing you to let you know that I and Mary want to have things as it always ways before. We dont want any Guardians. Will you tell P. H. Claussen to let all of us alone we have given our property to those who we want to have it. We are going to stay with John Meyer. We are satisfied with everything he and Arthur Sievert do. I told John to send you this registered, and not to mail it in Charter Oak.

> Thank You.

> Anna Vogelpohl."

The envelope is addressed "Hon. Judge Bruce Snell, Ida Grove, Iowa." It has on it "Return Receipt Requested" and has the Mapleton, Iowa, postal stamp of July 14, 1951. It was marked "Registered" and had the required postage.

John Meyer, called as a witness by the guardian, testified on July 17, 1951:

"Since the hearing, she [Anna] has recorded a quitclaim deed to the land which she had me have prepared for her. My brother, Henry, took her to the recorder's office. The deed transferred the 966 acres to Art Sievert and myself. * * * The deed to the real estate, assignment of personal property and wills were executed in my presence on February 26, 1951. These

assignments covered some notes. These papers were prepared at my direction when Anna instructed me to do so. To my best recollection, the notes which were signed were in denominations of two, three and five thousand dollars. Anna just gave these notes to us as a gift. Mr. Sievert was not present when they were signed. Anna's reason for executing these papers was that she wanted to be safe. The wills do not provide that the property all go to me and Mr. Sievert, but to all her heirs. I don't know where the will is now. Maybe she does have it. I don't know. She told me after the hearing if the hearing went against her favor, she wanted to record the deed, so she recorded it. She said she put the real estate in our possession so that it would be safe, so that nobody could meddle in it. * * * Q. You were to keep it for her? A. Her and Mary. Q. Well, then there is this real estate, and these notes you say she gave you, and that is the only claim you have against the property at least formerly belonging to Mary and Anna' Vogelpohl? A. I think so. Q. You ought to know, shouldn't you? A. Well, she's got certain things of her own that I wouldn't even bother her with. Q. You mean you wouldn't take her clothes? A. Well, it is a little more than clothes. She always did have a few things of her own. She wanted us to have it and not anybody else. She said that I took care of her all these years and she didn't want anybody else to have it." (No cross-examination.)

Arthur H. Sievert was never called as a witness for the wards. His testimony we have hereinbefore set out was given as a witness for the guardian on July 17, 1951, when the hearing was reopened. He then testified:

"I typed the deed that Anna recorded in Crawford County, Iowa. It was prepared at Carroll. I have a portable typewriter and had it with me. I didn't see the girls, but prepared it for John after he told me that was what they wanted. I did not type the wills. They also signed other papers conveying property to me and John Meyer on the 26th which 'had to do with some notes. * * * I have these notes in my possession. I don't recall when they are payable. [At this point he told about the burial contracts.] * * * I cannot remember the number and amount of notes that Anna and Mary Vogelpohl signed to John Meyer and myself. I am making claim to several notes that they gave

to me and John Meyer jointly. These endorsements or assignments were made on February 26th. The assignments of the notes are to both of us jointly. I cannot state the total amount." (There was no cross-examination.)

The printed record, including all proceedings subsequent to the order of the court confirming the appointment of Mr. Claussen as guardian and nominating Mr. Cullison as personal guardian, was agreed upon by counsel to constitute the record on appeal, and it was so ordered by the trial court.

The chief contention of the appellants in their argument is that the appointment of Mr. Claussen as guardian, by the clerk on February 26, 1951, was beyond his power and authority and was void from its inception. The guardian contends to the contrary. Each side cites some Iowa Rules of Civil Procedure and Code sections. We will not discuss the issue, as in our judgment it is wholly moot. An order was made by the court by the clerk appointing Mr. Claussen and fixing the amount of his bond. Mr. Claussen qualified and began the performance of his duties. He was at least the de facto guardian, but the appeal in this case is from the order of the district court ratifying and confirming the appointment as made on February 26, 1951. The appellants invoked the jurisdiction of the court and asked for the appointment of Mr. Claussen. Later, by three or more applications, they again invoked the jurisdiction of the court to appoint not Mr. Claussen but John Meyer and Arthur H. Sievert as personal and property guardians. The court was not bound to appoint the nominee in any of the applications. It had jurisdiction to appoint any proper person, or to ratify and confirm the appointment of Mr. Claussen. It chose to do the latter. The evidence is wholly insufficient to revoke the appointment of Mr. Claussen. He is well qualified in every respect. There was no evidence to the contrary. The entire record most convincingly sustains the district court. The conduct of Mr. Sievert and John Meyer in handling the affairs and property of these incompetent ladies, their brazen deceit in not making full disclosure to the court, were all most reprehensible. Though Anna owned all of the property, John Meyer condescendingly testified: "She always did have a few things of her own."

The judgment is—Affirmed.

All JUSTICES concur.